IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RON GROUP, LLC d/b/a BLUE SKY SPECIALTY PHARMACY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACT. NO. 2:20-cv-1038-ECM [WO] |
| STEPHANIE MCGEE AZAR, in her official capacity as Commissioner of the Alabama Medicaid Agency, | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION and ORDER

### I.  INTRODUCTION

Now pending before the Court is a motion to dismiss the amended complaint filed by Defendant Stephanie McGee Azar, in her official capacity as Commissioner of the Alabama Medicaid Agency ("Commissioner"). (Doc. 26).  Ron Group, LLC d/b/a Blue Sky Specialty Pharmacy ("Plaintiff," "Ron Group," or "Blue Sky"), an Alabama Medicaid provider, brought this action against the Commissioner pursuant to 42 U.S.C. § 1983.  In its amended complaint, (doc. 24), Blue Sky alleges that the Commissioner violated Blue Sky's constitutional rights in her efforts to hold Blue Sky liable for the debt of another Medicaid provider, HemaCare Plus, LLC ("HemaCare"), without giving Blue Sky prior notice and an opportunity to defend itself.  Specifically, Blue Sky brings claims against the Commissioner for deprivation of procedural due process in violation of the Fourteenth Amendment (Count 1); unreasonable seizure in violation of the Fourth Amendment (Count

2); taking Blue Sky's property for public use without just compensation in violation of the Fifth Amendment's Takings Clause (Count 3); and an unconstitutional exaction under the Fifth Amendment (Count 4).[1]   Blue Sky seeks declaratory and injunctive relief as well as attorney's fees.

In her motion, the Commissioner requests dismissal of Blue Sky's amended complaint in its entirety, raising numerous jurisdictional, prudential, and substantive arguments.  The motion is fully briefed and ripe for review.  For the reasons that follow, the Commissioner's motion (doc. 26) is due to be DENIED.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] Counts 5–7 contain requests for a declaratory judgment, preliminary injunction, and permanent injunction, respectively.  However, these are not causes of action but rather requests for relief.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).  The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555–56.  This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citation omitted).  Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (citation omitted).

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, may be a factual or facial attack on subject matter jurisdiction. *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002).  A factual attack permits the district court to weigh evidence outside the pleadings to satisfy itself of the existence of subject matter jurisdiction in fact. *Id.* at 1237. However, a facial attack merely questions the sufficiency of the pleading. *Id.*  Under a facial attack, as here, the district court accepts the plaintiff's allegations as true and need not look beyond the face of the complaint to determine whether the court has subject matter jurisdiction. *Id.*

## IV.  FACTS[2]

### A.  Regulatory Background

Medicaid is a joint federal-state program that funds healthcare services for poor and disabled patients. *See generally* 42 U.S.C. § 1396a *et seq.* (the "Medicaid Act").  "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of [the Medicaid Act]." *Harris v. McRae*, 448 U.S. 297, 301 (1980).

Federal law requires state Medicaid plans to establish programs to identify and recoup overpayments to providers. *See* 42 U.S.C. § 1396a(a)(42)(B)(i).  When a state identifies an overpayment, it has one year to attempt to recover the overpayment before it must repay the federal share of the overpayment. *See id.* § 1396b(d)(2)(C); 42 C.F.R. § 433.316(a).

Federal regulations establish the following "Requirements for Notification" that states must follow in recouping overpayments from providers:

---

[2] This recitation of the facts is based upon Blue Sky's amended complaint and the two documents attached to the Commissioner's motion to dismiss: Blue Sky's provider agreement and a March 29, 2021 letter from Medicaid to Blue Sky.  Although the Court ordinarily cannot consider anything outside the pleadings in ruling on a motion to dismiss, the Court may consider materials that are "central to the plaintiff's claim" if no party disputes their authenticity. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).  In its response in opposition to the motion to dismiss, Blue Sky did not argue that the documents are not central to its claims.  Based on the Court's independent review, the Court concludes that the documents are central to Blue Sky's claims: in its amended complaint, Blue Sky mentions that it has a provider agreement, (doc. 24 at 4, para. 15), and also references the March 2021 letter, (*id.* at 10, paras. 51–53).  Moreover, no party has disputed the authenticity of these documents.

The Court recites only the facts pertinent to resolving the Commissioner's motion to dismiss.  At this stage of the proceedings, for purposes of ruling on the motion, the facts alleged in the amended complaint and contained within the documents mentioned above, and the reasonable inferences drawn therefrom, are set forth in the light most favorable to Blue Sky.

> Unless a State official or fiscal agent of the State chooses to initiate a formal recoupment action against a provider without first giving written notification of its intent, a State Medicaid agency official or other State official *must notify the provider in writing* of any overpayment it discovers in accordance with State agency policies and procedures and must take *reasonable* actions to attempt to recover the overpayment *in accordance with State law and procedures*.

42 C.F.R. § 433.316(b) (emphases added).  Thus, federal law requires Alabama Medicaid to follow its own procedures in notifying providers about overpayments.

Alabama regulations state that Medicaid "will actively seek recovery of all misspent Medicaid funds . . . recoverable under federal law." Ala. Admin. Code r. 560-X-33-.01. "By entering into a contract with Medicaid, the provider acknowledges that payments thereunder are subject to review, audit, adjustment and recoupment actions." *Id.* 560-X-1.13(3).  One purpose of the recoupments is "to correct erroneous payments to providers" through "solicitation of voluntary reimbursement and administrative and legal remedies in keeping with limitations set by federal guidelines." *Id.* 560-X-33-.02.

Alabama regulations also mandate a procedure for recoupment of overpayments to a provider.  When Medicaid originally identifies an overpayment that may be subject to recoupment, "a letter will be sent to the recipient/authorized representative or provider outlining the allegations and stating the amount of reimbursement and the specific dates when overpayment or recoverable benefits occurred." *Id.* 560-X-33-.04(1).  This letter takes the form of a Draft Audit Report.  After receiving a Draft Audit Report, providers have an opportunity to respond in writing and provide supporting documentation to challenge Medicaid's findings. *See id.* (stating that providers are "offered the opportunity

to present evidence to rebut the requirement for recoupment or to submit the reimbursement"). Medicaid then reviews the provider's response and reevaluates the amount of overpayments accordingly. Medicaid then issues a Final Audit Report stating the amount of overpayments it believes the provider is responsible for repaying. The Final Audit Report also notifies the provider that, unless the provider agrees to directly reimburse Medicaid, Medicaid will recoup the overpayments from the provider's future claims. *See id.*; *id.* 560-X-33-.04(3)(b).

Alabama regulations permit Medicaid to seek recoupment from both the original provider who received the overpayments and any successor provider: "In the event of any transfer, sale, assignment, merger or replacement between and among providers, Medicaid may look both to the original provider and any successor, transferee or replacement provider for recovery of any funds improperly paid." *Id.* 560-X-1.13(3). Thus, "[p]roviders should take this right of Medicaid into account and make appropriate provision therefor in their business transactions." *Id.*

If a provider is aggrieved by Medicaid's decision related to recoupment, it may appeal by requesting a fair hearing. *Id.* 560-X-33-.07. The fair hearing is an adversarial proceeding: it is conducted before an impartial hearing officer, the provider may be represented by counsel, and either side may call witnesses and put on evidence. *Id.* 560-X-3-.04. However, recoupment is not automatically abated during the fair hearing. Pursuant to the Alabama Administrative Procedure Act, an adverse decision after a fair hearing may be appealed to the Circuit Court of Montgomery County and from there to the Alabama

6

Court of Civil Appeals or the Alabama Supreme Court. ALA. CODE § 41-22-20, -21.

### B. Blue Sky and HemaCare

#### 1. Blue Sky Becomes a Medicaid Provider

Blue Sky is a specialty pharmacy serving, among others, low-income Alabamians who suffer from hemophilia.[3]  A "significant portion" of Blue Sky's Alabama patients are on Medicaid. (Doc. 24 at 1–2, para. 1).  Blue Sky submits claims for reimbursement to the Alabama Medicaid Agency, which in turn pays the claims through a fiscal intermediary.

On February 14, 2020, Blue Sky entered into an Asset Purchase Agreement with HemaCare, an Alabama Medicaid provider that operated a specialty pharmacy in Daphne, Alabama.  Under the terms of the Asset Purchase Agreement, Blue Sky did not purchase or agree to assume HemaCare's debts or liabilities.  Moreover, HemaCare's debts or liabilities were not reflected in the purchase price.  The transaction closed on February 29, 2020.

To avoid a gap in coverage for patients' treatments, Blue Sky entered into a Temporary Limited Power of Attorney with HemaCare.  For approximately a month, Blue Sky submitted claims for reimbursement to Alabama Medicaid under HemaCare's provider number until Blue Sky could obtain its own.

On April 16, 2020, Blue Sky submitted to the Alabama Medicaid Agency a provider enrollment application, seeking to be enrolled as a separate Medicaid provider with a

---

[3] Hemophilia is a rare blood disorder in which the blood does not clot properly. *Hemophilia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/hemophilia/symptoms-causes/syc-20373327 (last visited Nov. 27, 2021).

unique provider number.  As part of the enrollment application, Blue Sky signed a provider agreement.  The provider agreement states in relevant part: "In the event that Provider acquires or has acquired ownership of another MEDICAID provider through transfer, sale, assignment, merger, replacement or any other method, whether or not a new [Provider] Agreement is required, Provider shall be responsible for any unrecovered improper MEDICAID payments made to the previous provider." Doc. 26-1 at 8.  On April 17, 2020, Medicaid's fiscal agent notified Blue Sky that its application had been processed and its provider number was effective retroactive to April 1, 2020.  Since then, Blue Sky has submitted reimbursement claims to Medicaid pursuant to Blue Sky's separate provider agreement and provider number.

### 2.  Medicaid Audits HemaCare

On December 13, 2019, Medicaid sent a Draft Audit Report to HemaCare regarding reimbursement claims HemaCare submitted in 2018.  In response, HemaCare requested reevaluation of the results of the Draft Audit Report and submitted supporting documentation with that request.  As a result, Medicaid found that HemaCare had not been overpaid for some of the claims, and Medicaid removed some recoupment codes from the audit.

On February 27, 2020, the Commissioner sent HemaCare a Final Audit Report regarding HemaCare's 2018 claims.  The Final Audit Report stated that the Commissioner had overpaid HemaCare $5,159,042.82 for claims HemaCare submitted in 2018.

Blue Sky was not aware of the audit or alleged overpayments when it entered into the Asset Purchase Agreement with HemaCare.  Blue Sky did not learn about the audit or alleged overpayments until March 8, 2020.  Blue Sky had no opportunity to participate in, nor did it have knowledge of, the Draft Audit Report process, and Blue Sky was not involved in any stage of the audit.  Additionally, Blue Sky was not involved in treating the patients or submitting the claims identified in the Final Audit Report.

### 3.   Medicaid Pursues Blue Sky for the Alleged Overpayments to HemaCare

In March 2020, Medicaid began earmarking for recoupment certain amounts from claims Blue Sky submitted under HemaCare's provider number under the Temporary Limited Power of Attorney.  Even after Blue Sky enrolled in Medicaid under a separate provider agreement and provider number in April 2020, Medicaid continued to earmark certain amounts for recoupment from Blue Sky's clean claims.  According to Blue Sky, by doing so, Medicaid has been withholding full reimbursements owed to it for its clean claims that are separate from HemaCare's claims that allegedly resulted in overpayments in 2018. Blue Sky alleges that the Commissioner did not give it any notice or a hearing before she started recouping against Blue Sky's clean claims.

On March 19, 2020, HemaCare requested a fair hearing regarding the results of the Final Audit Report.  However, the Commissioner did not give HemaCare a fair hearing. Instead, the Commissioner pursued Blue Sky for the alleged overpayments to HemaCare,

as described above.  HemaCare subsequently left the State of Alabama and has not been "seen or heard from again." (Doc. 24 at 9, para. 47).

In September 2020, after recoupments had already begun, Blue Sky received from Medicaid a letter addressed solely to HemaCare.  The letter was Medicaid's February 27, 2020 Final Audit Report to HemaCare finding $5,159,042.82 in overpayments to HemaCare in 2018.  The Final Audit Report does not mention Blue Sky, does not state a basis for Blue Sky's liability, and does not state the possibility that the $5.1 million could be assessed against another entity.  By the time Blue Sky received the Final Audit Report, it had already become final.

Blue Sky filed this lawsuit on December 15, 2020.  On March 29, 2021, Medicaid sent Blue Sky a letter stating that Medicaid had determined Blue Sky was responsible for the alleged overpayments to HemaCare pursuant to Blue Sky's provider agreement.  The letter further states that Medicaid is willing to allow Blue Sky to pursue a fair hearing. Additionally, the letter included a copy of the Final Audit Report that Medicaid had sent to HemaCare in February 2020.  According to Blue Sky, the Commissioner will not allow HemaCare to participate in the fair hearing.

While the Commissioner agreed to temporarily cease recoupment against Blue Sky, Blue Sky "has no assurance that she will not begin again." (*Id.* at 8, para. 36).  As of the filing of the amended complaint (April 29, 2021), the Commissioner has earmarked for recoupment a net total of $1,174,448.75 from Blue Sky's clean claims.

10

# V.  DISCUSSION

The Commissioner moves to dismiss Blue Sky's amended complaint on numerous grounds.  She argues: the suit is barred by sovereign immunity, the Court should abstain from exercising jurisdiction, Blue Sky's due process claim is moot, Blue Sky's claims are really state law contract claims that cannot be brought under § 1983, Blue Sky is not entitled to equitable relief because it has an adequate remedy at law, and all of Blue Sky's claims fail on the merits.  The Court will address each argument.

## A.  Sovereign Immunity

The Commissioner argues that sovereign immunity bars Blue Sky's suit.  She contends that this suit is not permitted under the *Ex parte Young* exception for declaratory or injunctive relief because this suit is in substance a request for money damages from the State.  Alternatively, she contends that the suit is barred because it asks this Court to instruct the Commissioner, an Alabama official, how to comply with Alabama law.  Blue Sky counters that *Ex parte Young* permits the suit and that Blue Sky seeks to have the Commissioner comply with federal, not state, law.  Alternatively, Blue Sky argues that the Commissioner waived the State's sovereign immunity.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  The amendment expressly forbids only suits brought against a State by citizens of another state. *Accord Papasan v. Allain*, 478 U.S.

11

265, 276 (1986).  However, the Supreme Court has long held that the Eleventh Amendment similarly prohibits suits brought against a State by the State's own citizens. *See Hans v. Louisiana*, 134 U.S. 1 (1890).  "Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) (citation omitted).[4]

### 1. Waiver

The Court is not persuaded that the State has waived its sovereign immunity. Neither the Commissioner, the Legislature, nor any other state authority may waive Alabama's sovereign immunity. *See Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *Stroud v. McIntosh*, 722 F.3d 1294, 1303 (11th Cir. 2013).  Further, the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one" that requires a "clear declaration" of such waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999) (citations omitted).  This test is not met when the State "merely stat[es] its intention to 'sue and be sued,'" or even

---

[4] But the Eleventh Amendment's jurisdictional bar "is a 'rather peculiar kind of "jurisdictional" issue.' Unlike most subject matter jurisdiction issues, which cannot be waived by the parties and must be raised by a court on its own initiative, the Eleventh Amendment does not automatically deprive a court of original jurisdiction." *Id.* at 1257 (citation omitted).  "Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so." *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998).

when it "authoriz[es] suits against it 'in any court of competent jurisdiction.'" *Id.* at 676 (citations omitted).

Blue Sky contends that the provider agreement's venue provision, Alabama Administrative Rule 560-X-33-.04(4), or both demonstrate that the State has waived its sovereign immunity.   This argument is unavailing.   The provider agreement's venue provision does not operate to waive sovereign immunity because the provision expressly states that it does not "enlarge the jurisdiction" of this Court but instead is a "stipulation as to venue." Doc. 26-1 at 7 § 1.2.8. Because sovereign immunity implicates federal jurisdiction, the venue provision in fact expressly disclaims waiver.  Nor does Rule 560-X-33-.04(4)'s provision that "[c]ivil actions through the courts may be initiated" waive sovereign immunity in light of *College Savings Bank* and the other authorities cited above. In sum, neither the venue provision nor Rule 560-X-33-.04(4) constitute a "clear declaration" that the State has waived its sovereign immunity.

### 2. *Ex parte Young*

Notwithstanding the State's sovereign immunity, a suit for declaratory or injunctive relief against a state official may be permitted under *Ex parte Young*, 209 U.S. 123 (1908). One of the principles underlying *Ex parte Young* is that it is not offensive to state sovereignty or federalism to instruct a state official to comply with *federal* law.  Indeed, "[t]he State has no power to impart to [the state official] any immunity from responsibility to the Supreme Authority of the United States." *Id.* at 160.  To determine whether *Ex parte Young* applies to avoid the Eleventh Amendment bar, the Court "need only conduct a

13

'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). This inquiry "does not include an analysis of the merits of the claim." *Id.* at 646. "An *allegation* of an ongoing violation of federal law . . . is ordinarily sufficient." *Coeur d'Alene*, 521 U.S. at 281 (majority opinion) (emphasis added).

 *Ex parte Young* may permit the suit even if the equitable relief has an "ancillary effect on the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). In fact, such an ancillary effect is "often an *inevitable* consequence of the principle announced in *Ex parte Young*." *Id.* (emphasis added). The key inquiry is whether monetary relief is a necessary result of compliance with a decree that is prospective. *Id.* For example, in *Graham v. Richardson*, 403 U.S. 365 (1971), state officials were enjoined from denying welfare benefits to otherwise qualified recipients who were noncitizens because such denials violated the equal protection clause. And in *Goldberg v. Kelly*, 397 U.S. 254 (1970), New York City officials were enjoined from following New York state procedures which allowed them to terminate welfare benefits without a prior hearing because such terminations denied welfare recipients procedural due process. As the Supreme Court explained, "the fiscal consequences to state treasuries in [those] cases were the necessary result of compliance with decrees which by their terms were prospective in nature." *Edelman*, 415 U.S. at 668.

To be sure, *Ex parte Young* does not allow "any form of relief[,] . . . no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature." *Id.* at 666. "If the prospective relief sought is the functional equivalent of money damages," meaning "'[i]t is measured in terms of a monetary loss resulting from a past breach of a legal duty,' *Ex parte Young* does not apply." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1337 (11th Cir. 1999) (quoting *Edelman*, 415 U.S. at 669). The distinction between suits allowable and forbidden is slight. *Papasan*, 478 U.S. at 279. To determine on which side a particular suit falls, courts must look at the substance rather than the form of relief sought and be guided by the principles underlying *Ex parte Young*. *Id.* *Papasan* itself illustrates the fine distinction. In *Papasan*, Mississippi school officials and schoolchildren alleged that they were unlawfully being denied the economic benefits of public school lands previously granted to Mississippi by the United States. *Id.* at 267–68. The plaintiffs brought a trust claim and an equal protection claim. *Id.* at 274. The Supreme Court held that the plaintiffs' trust claim was barred by the Eleventh Amendment, but the equal protection claim was not. *Id.* at 281–82. Regarding the trust claim, the plaintiffs' theory of the state's continuing obligation to meet its trust responsibilities was that the trustee was required, "because of the past loss of the trust corpus, to use its own resources to take the place of the corpus or the lost income from the corpus." *Id.* at 281. The Court reasoned that the continuing payment of income from the lost corpus was economically equivalent to "a one-time restoration of the lost corpus itself"; thus, it was in substance an award of "an accrued monetary liability," which the

15

Eleventh Amendment forbids. *Id.* (citation omitted).   By contrast, the alleged equal protection violation was the state's ongoing unequal distribution of the benefits of the state's school lands. *Id.* at 282.  The essence of the constitutional violation was the *present* disparity in the distribution of the benefits of state-held assets and not the past actions of the state. *Id.*  The Court held that the "alleged ongoing constitutional violation . . . is precisely the type of continuing violation for which a remedy may permissibly be fashioned under [*Ex parte*] *Young*." *Id.*

Blue Sky's amended complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *See Verizon Md., Inc.*, 535 U.S. at 645 (citation omitted).  Blue Sky alleges that the Commissioner threatens to take, in the future, portions of Blue Sky's reimbursements for services rendered to Medicaid patients in order to satisfy another Medicaid provider's debt, despite the Commissioner never providing Blue Sky with predeprivation notice or opportunity to be heard.   Similarly, Blue Sky alleges that the Commissioner's threatened recoupment efforts without predeprivation process constitute an unreasonable seizure of Blue Sky's property, an unconstitutional taking, and an unconstitutional exaction.  This sufficiently alleges an ongoing violation of Blue Sky's federal constitutional rights.  And viewing the facts and drawing all reasonable inferences in Blue Sky's favor, Blue Sky's requested relief is prospective: it seeks to stop the Commissioner's future recoupment efforts against Blue Sky because such efforts will be undertaken in violation of Blue Sky's constitutional rights.  Thus, the substance of the

relief sought is to remedy the Commissioner's alleged violations of Blue Sky's constitutional rights.

The Commissioner contends that the Eleventh Amendment bars Blue Sky's suit because it is in essence a request for money damages from the State. This is so, according to the Commissioner, because Blue Sky seeks to have the Court order the Commissioner to remit to Blue Sky full reimbursements for its clean claims without an offset for the alleged overpayments—in other words, to give Blue Sky more money than the Commissioner wishes. The Commissioner also points out that Blue Sky does not request relief in the form of notice and a hearing but rather asks the Court to declare that the Commissioner can never recoup the alleged overpayments from Blue Sky. But the Commissioner reads Blue Sky's amended complaint too narrowly. The Court must read the amended complaint as a whole, which alleges that the Commissioner seeks to hold Blue Sky liable for another provider's debt without giving Blue Sky predeprivation notice and an opportunity to be heard. Based on Blue Sky's amended complaint, each time the Commissioner recoups against Blue Sky's clean claims in the future would violate Blue Sky's Fourteenth Amendment due process rights because Blue Sky has not received predeprivation process. And it follows that such recoupment would violate Blue Sky's Fourth and Fifth Amendment rights because the Commissioner will be seizing and taking portions of Blue Sky's reimbursements without affording Blue Sky predeprivation process. Thus, looking at the substance rather than the form of the request relief, Blue Sky does not seek an award of an "accrued monetary liability," *see Papasan*, 478 at 281 (citation

omitted), but rather seeks to enjoin the Commissioner's alleged ongoing violations of its Fourteenth Amendment due process rights and the attendant violations of its Fourth and Fifth Amendment rights.

Additionally, while Blue Sky does not expressly request relief in the form of notice and a hearing, this is not dispositive. In addition to Blue Sky's request that the Court declare it not to be liable for the alleged overpayments to HemaCare, Blue Sky requests "any other relief the Court deems appropriate." (Doc. 24 at 18). The remedy for a violation of due process is process. Thus, the "other relief" Blue Sky seeks could include a declaration that the Commissioner's actions violate Blue Sky's due process rights and an injunction prohibiting the Commissioner from recouping the alleged overpayments from Blue Sky unless and until she affords Blue Sky adequate predeprivation process. Moreover, Blue Sky's requested relief could also encompass an injunction preventing the Commissioner from recouping against Blue Sky if the Commissioner determines, during constitutionally adequate predeprivation process, that Blue Sky does not bear successor liability for the overpayments to HemaCare.

True, such an injunction may have an impact on the state treasury in that it would prevent the Commissioner from immediately recouping from Blue Sky in the manner she desires, which in turn means the Commissioner would have to pay Blue Sky the full reimbursements it is otherwise due for its clean claims. But this would have only an ancillary impact on the state treasury because the impact would be the "necessary result of compliance" with a decree that prospectively enjoins the Commissioner from taking

18

actions in derogation of Blue Sky's Fourteenth, Fourth, and Fifth Amendment rights: withholding portions of Blue Sky's reimbursements to satisfy the debt of another Medicaid provider without giving Blue Sky any predeprivation process. *See Edelman*, 415 U.S. at 668.

The Court agrees with Blue Sky that *Turner v. Ledbetter*, 906 F.2d 606 (11th Cir. 1990), supports the conclusion that the Eleventh Amendment does not bar this suit. In *Turner*, the State of Georgia tried to recoup money it believed was improperly overpaid to recipients of the Aid to Families with Dependent Children ("AFDC") program, a joint federal-state program. *See id.* at 608. The district court granted summary judgment in favor of the AFDC recipients and enjoined the recoupment because Georgia had failed to give the recipients adequate notice that their benefits were being terminated. *See id.* Like the Commissioner here, Georgia "argue[d] that the present injunction against the recoupment of overpayment violates the [E]leventh [A]mendment because it applies retroactively and has a direct impact on the state treasury." *Id.* at 609. The Eleventh Circuit disagreed. Like Blue Sky, the AFDC recipients were "not seeking damages, but rather [were] seeking to prevent the state from essentially accomplishing a legal termination of . . . benefits without providing adequate notice under federal law." *Id.* at 609–10.

The Commissioner insists that *Turner* is inapposite because the court held that the payments to benefit recipients were *not* overpayments because Georgia failed to property terminate the benefits, and thus the payments could not be recouped. The Court is not persuaded. The *Turner* plaintiffs argued that they had not received any overpayments.

19

Similarly, Blue Sky alleges that it did not receive any alleged overpayments—HemaCare did—and that Blue Sky is not responsible for them despite the Commissioner's insistence that Blue Sky bears successor liability.[5]  Although in *Turner* the benefit recipients had received the funds alleged to be overpayments, both cases present the question of whether to characterize the funds as overpayments.  In *Turner*, the plaintiffs argued that the state's attempt to terminate their benefits was illegal because the state did not provide adequate notice of the termination.  Similarly, Blue Sky asserts that the Commissioner's attempt to reduce its reimbursements via recoupment is illegal because the Commissioner did not provide prior notice and opportunity to be heard.  At this stage, viewing the facts and drawing all reasonable inferences in Blue Sky's favor, the Court finds that Blue Sky's suit is a permissible request for declaratory and injunctive relief under *Ex parte Young* and is not barred by the Eleventh Amendment.

### 3. *Pennhurst*

It follows from the above analysis that Blue Sky's suit is not barred by *Pennhurst*. The Eleventh Amendment bars suits for injunctive relief against state officials premised on their alleged violations of state law alone. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 121 (1984); *Papasan*, 478 U.S. at 277.  However, Blue Sky is not asking the Court to direct the Commissioner to comply with state law.  Instead, as explained above, Blue Sky is asking the Commissioner to comply with federal law—specifically, the

---

[5] The procedural posture is different here than in *Turner*.  Here, the Court is evaluating a motion to dismiss, and it must accept Blue Sky's well-pleaded factual allegations as true.

mandates of the Fourteenth, Fourth, and Fifth Amendments.  Thus, Blue Sky's suit is not prohibited under *Pennhurst*.

## B. Abstention

The Commissioner also argues that the Court should abstain from exercising jurisdiction over Blue Sky's suit.  "Federal courts should abstain from exercising their jurisdiction if doing so would 'disregard the comity between the States and the National Government.'" *Wexler v. Lepore*, 385 F.3d 1336, 1339 (11th Cir. 2004) (per curiam) (citation omitted).  "While such abstention 'espouses a strong federal policy,' it remains 'the exception, not the rule' to the federal courts' 'virtually unflagging' duty 'to adjudicate claims within their jurisdiction.'" *Id.* (citations omitted).

The Commissioner argues that the Court should decline jurisdiction under either the *Burford*[6] or *Pullman*[7] abstention doctrines.  The Court addresses each argument in turn.

### 1. *Burford*

"*Burford* is 'an extraordinary and narrow exception' to a federal court's 'virtually unflagging obligation' to exercise jurisdiction." *Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1327 (11th Cir. 2021) (citations omitted).  "A central purpose furthered by *Burford* abstention is to protect complex state administrative processes from undue federal interference." *Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000) (en banc) (per curiam).  However, *Burford* "does not require abstention whenever there exists such a

---

[6] *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

[7] *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 362 (1989) (citation omitted) (hereinafter "*NOPSI*").  As the Supreme Court stated in *NOPSI*:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Id.* at 360–61.

First, the Court is not convinced that the implicit prerequisite of "timely and adequate state-court review" is satisfied here.  According to the amended complaint, the state-court review available to Blue Sky is a "fair hearing," which is an administrative postdeprivation appeal.  Recoupment is not automatically abated during the fair hearing. Thus, it appears to the Court that this postdeprivation appeal is neither timely nor adequate to remedy the denial of predeprivation process.

Additionally, this case does not threaten to interfere with all or a substantial part of Alabama's Medicaid regime.  Rather, Blue Sky's claims target the Commissioner's discrete procedures and practices regarding Medicaid's recoupment from Blue Sky of alleged overpayments to another Medicaid provider. *See Siegel*, 234 F.3d at 1173 (using similar reasoning in holding that *Burford* did not warrant abstention from challenge to

Florida's recount procedures during 2000 presidential election).  Specifically, Blue Sky challenges the Commissioner's practices as constitutionally infirm because she allegedly failed to provide Blue Sky with predeprivation process.  The Court is not persuaded that this constitutes "undue federal interference" with Alabama Medicaid processes.

The Commissioner argues that a difficult issue of state law is at stake here: determining successor liability for Medicaid providers based on Medicaid's provider agreement and the Alabama administrative regulations.  But the Court would not be interfering with the determination of this difficult state law issue.  Rather, the Court would merely seek to ensure that Medicaid's recoupment procedures comport with the United States Constitution.  Additionally, the Medicaid Act reveals Medicaid to be the subject of both state and federal concern, *see Curtis v. Taylor,* 648 F.2d 946, 949 (5th Cir. 1980), thereby undermining any argument that this Court's review would unduly interfere with state processes, *see J.M. by and through Lewis v. Crittendon*, 2018 WL 7079177, at *4 (N.D. Ga. May 21, 2018).

Similarly, the Court is not persuaded that exercising jurisdiction over suits like this one would disrupt Alabama's efforts to establish a coherent policy with respect to recouping overpayments.  Blue Sky does not challenge Alabama Medicaid's recoupment regulations themselves.  Rather, Blue Sky challenges the Commissioner's alleged failure to provide Blue Sky with predeprivation process before taking portions of Blue Sky's clean claims to satisfy the debt of another provider.  The Commissioner makes no argument that ensuring compliance with federal constitutional requirements is the kind of disruption that

23

*Burford* abstention seeks to avoid.  In sum, the Commissioner has failed to show that her concerns "justify [the Court's] abstention under th[e] narrow [*Burford*] doctrine." *Siegel*, 234 F.3d at 1173.

### 2. *Pullman*

The Commissioner argues in the alternative that the Court should abstain from Blue Sky's suit under the *Pullman* abstention doctrine.  Under this doctrine, federal courts defer to "state court resolution of underlying issues of state law." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965).  *Pullman* abstention is appropriate where two elements are met: "(1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented." *Siegel*, 234 F.3d at 1174.  "Because abstention is discretionary, it is *only* appropriate when the question of state law can be fairly interpreted to avoid adjudication of the constitutional question." *Id.* (emphasis added).

The Court concludes that *Pullman* abstention is also not warranted.  According to the Commissioner, the unsettled questions of state law are "matters of first impression as to Alabama Medicaid's specific successor liability regulation and provider agreement provision," and also a general area of law that has seen conflict—successor liability under Alabama law. (Doc. 26 at 21).  The Commissioner then generally argues that the Court must determine these state law issues before deciding the constitutional claims because the constitutional claims are "explicitly premised on [Blue Sky's] alleged status as 'a new party' or 'unrelated entity.'" (*Id.*).  But the Commissioner does not articulate *how*

24

determining the state law question would "avoid adjudication of the constitutional question," *see Siegel*, 234 F.3d at 1174.  And the Court does not see how the constitutional questions would be avoided.  If the Commissioner had correctly determined that Blue Sky bears successor liability for the overpayments to HemaCare, the constitutional question would remain regarding whether the Commissioner gave Blue Sky predeprivation process.  Moreover, it would not avoid deciding the constitutional questions of whether the Commissioner's recoupment efforts to satisfy the debt of another provider without predeprivation process constitute an unreasonable seizure of Blue Sky's property, an unconstitutional taking, or an unconstitutional exaction.  Accordingly, the Commissioner has failed to demonstrate that this Court should abstain under the *Pullman* doctrine.

## C.  Merits

The Commissioner also argues that Blue Sky's claims fail on the merits because Blue Sky fails to plausibly allege a Fourteenth Amendment due process claim, a Fourth Amendment seizure claim, a Fifth Amendment takings claim, or a Fifth Amendment exaction claim.

### 1.  Due Process

A procedural due process claim requires "proof of three elements: (1) the deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayson v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).  The presence of state action is undisputed.  The Commissioner argues that Blue

Sky's claim fails because it lacks a protected property interest and because adequate process is available to it.  The Court will address each argument in turn.

### a.  Property Interest

"[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms.  Rather, property denotes a broad range of interests that are secured by existing rules or understandings." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012) (alteration in original) (quoting *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). A party may have a protected property interest in a government benefit when he or she has "a legitimate claim of entitlement to it" based on "an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

Blue Sky argues that Alabama law gives it a legitimate claim of entitlement to Medicaid reimbursements for its clean claims.  The Court agrees.  The Commissioner, through Medicaid's fiscal agent, must pay all clean claims within twelve months of receipt. *See* Ala. Admin. Code r. 560-X-.17(5)(a) ("Except as otherwise provided above, the Medicaid fiscal agent *must process and pay* all clean claims within 12 months of receipt of the claim." (emphasis added)).  The Commissioner does not argue that Blue Sky lacks a property interest in reimbursements for clean claims for services rendered.  Accordingly, any argument that Blue Sky lacks such a property interest has been forfeited.

The Commissioner argues that Blue Sky lacks a property interest in overpayments or funds subject to recoupment.  Assuming without deciding that the Commissioner is correct, the Court disagrees with the Commissioner's characterization of Blue Sky's

26

asserted property interest.  As explained above, Blue Sky asserts a property interest in receiving full reimbursements for clean claims for services rendered.  The Commissioner's argument fails to disaggregate the full reimbursements for clean claims from the alleged overpayments.  Additionally, the Commissioner's position assumes the conclusions that there were overpayments to HemaCare and that Blue Sky is responsible for them— conclusions that Blue Sky disputes and asserts it had no notice of or opportunity to respond to.  In light of the foregoing, the Court concludes that Blue Sky has adequately alleged a protected property interest in full reimbursements for services rendered to Medicaid patients.

### b.  Inadequate Process

The Court now turns to the question of whether Blue Sky received due process. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of" the Fourteenth Amendment's Due Process Clause. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Courts consider three factors in determining whether the procedural due process provided is adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335; *accord Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019).

"In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990); *see Barr v. Johnson*, 777 F. App'x 298, 301 (11th Cir. 2019) ("Generally speaking, procedural due process requires that the state give the individual notice and an opportunity to be heard *before* a deprivation." (emphasis added)).  The Supreme Court has recognized exceptions to this general rule where predeprivation process is not feasible because the state official's action was random or unauthorized.  In *Parratt v. Taylor*, the Court determined that a prison official, in negligently mishandling and losing a prisoner's mail, had violated the prisoner's due process rights, but the official's actions were "not the result of some established state procedure." 451 U.S. 527, 541 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 333 (1986) (holding that process is not constitutionally required to remedy negligent deprivations).  Because the deprivation was instead the result of a "random and unauthorized act of a state employee," the state could not anticipate the official's actions in advance, and thus it was not feasible for the state to provide a predeprivation hearing. *Id.* Accordingly, the Court held that the state's availability of a postdeprivation tort remedy cured the due process violation. *Id.* at 544.  "*Parratt* is not an exception to the *Mathews* balancing test, but rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of predeprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Zinermon*, 494 U.S. at 129.  And in *Hudson v. Palmer*, the Court extended *Parratt*'s reasoning to a prison official's intentional and

malicious destruction of a prisoner's property because, as in *Parratt*, the official was not acting according to an established state procedure but rather pursuant to a random and unauthorized personal vendetta against the prisoner. 468 U.S. 517, 521 n.2, 533 (1984). The Court reasoned that the state "can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Id.* at 533. Thus, the Court held that the availability of an adequate postdeprivation tort remedy was all the process that was constitutionally required. *Id.*

Blue Sky alleges that it did not receive notice or an opportunity to participate in the determination of the overpayments to HemaCare or on the issue of successor liability before the Commissioner started recouping against Blue Sky's clean claims. The Commissioner argues that Blue Sky fails to state a plausible due process claim because adequate postdeprivation remedies are available to Blue Sky in the form of a fair hearing and subsequent appeal to the Alabama state courts. The Commissioner relies heavily on *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (en banc), particularly *McKinney*'s statement that "procedural due process violations do not become complete 'unless and until the state refuses to provide due process.'" (Doc. 26 at 25) (quoting *McKinney*, 20 F.3d at 1562). Blue Sky argues that *McKinney* is inapposite and the availability of postdeprivation remedies are irrelevant because Blue Sky was denied *predeprivation* process to which it was entitled and which the State could have feasibly provided.

The Court agrees with Blue Sky. Considering the *Mathews* factors, the Court concludes that Blue Sky has plausibly alleged that it was entitled to predeprivation process.

29

Under the allegations of the amended complaint,  Blue Sky has a strong private interest in receiving full payments for services rendered to Medicaid patients.  Second, allowing providers to present their side of the story case is "of obvious value in reaching an accurate decision." *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985) (applying *Mathews* factors to case involving discharge of public employees).  Both overpayments and determinations of successor liability will be fact-intensive inquiries that would be more accurate if providers were allowed to be heard and present their own supporting evidence predeprivation.  Finally, the state's interest in immediate recoupment does not outweigh these interests.   True, federal law requires that the state repay the federal share of overpayments within one year of discovery.  But an argument that affording providers notice and an opportunity to respond prior to recoupment would impose either a "significant administrative burden" or "intolerable delays," *see id.*, would require the type of fact-intensive inquiry that counsels against granting a motion to dismiss.  In any event, the Commissioner does not argue that providing predeprivation notice would be burdensome or cause intolerable delays.  And with respect to overpayments, Alabama regulations already require that providers receive notice and an opportunity to respond with supporting documents before recoupment begins.  The Commissioner gave HemaCare notice and an opportunity to respond to the overpayment determination before she started recoupments against HemaCare.  According to the amended complaint, a little over two months elapsed between Medicaid's sending HemaCare the Draft Audit Report and the Final Audit Report—much less than the one-year window in which Alabama Medicaid

must repay the federal share.   Based on the previous—and recent—provision of predeprivation procedures to HemaCare and the Commissioner's failure to argue that predeprivation process for Blue Sky was not feasible, the Court finds that Blue Sky has plausibly alleged that it was entitled to predeprivation process under *Mathews*.

Additionally, the Commissioner's reliance on *McKinney* is misplaced.   In *McKinney*, a teacher who had been fired argued that his due process rights had been violated because the board overseeing his pre-termination hearing was biased against him. 20 F.3d at 1560–61.   The teacher had undisputedly received prior written notice of the charges against him and an "opportunity to present his side of the story" at a pre-termination hearing. *Id.* at 1561–62.   The court held that the teacher was due nothing more than an adequate postdeprivation remedy. *Id.* at 1563.   The court reasoned that, because the alleged bias was random and unauthorized, the *Parratt* rationale applied, and thus "only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation." *Id.* at 1563.   The court concluded that the postdeprivation remedies available in the state courts were constitutionally adequate. *Id.* at 1563–64.   Blue Sky's claim differs from *McKinney* in material respects.   Unlike the teacher in *McKinney* who received written notice of the charges against him and a pre-termination hearing, Blue Sky alleges that it received zero predeprivation notice or opportunity to be heard regarding the overpayments or the Commissioner's determination that Blue Sky bore successor liability for them.   The *McKinney* plaintiff's claim was that the pre-termination hearing was constitutionally infirm because of alleged bias, whereas Blue Sky's claim is

that it received no predeprivation process whatsoever. Thus, the claims presented are materially different.

Here, the recoupment against Blue Sky was pursuant to an established state procedure: Alabama administrative regulations both contemplate and regulate recoupment of overpayments, and they also contemplate collecting overpayments from a successor. Thus, the Commissioner's actions in depriving Blue Sky of its reimbursements via recoupment were neither random nor unauthorized like the officials' actions in *Parratt* and *Hudson*. Indeed, the Commissioner makes no argument that the actions taken were random or unauthorized or that it was not feasible to provide predeprivation process.[8] Thus, the Court concludes that Blue Sky has plausibly alleged that it was feasible to give Blue Sky predeprivation notice and an opportunity to be heard. "Where," as here, "a deprivation of property is authorized by an established state procedure and it is practicable for the State to provide pre-deprivation procedures, due process has been consistently held to require pre-deprivation notice and a hearing in order to reduce the possibility of a wrongful deprivation." *Fetner v. City of Roanoke*, 813 F.2d 1183, 1186 (11th Cir. 1987).

---

[8] The Commissioner briefly argues in her reply brief that, assuming Blue Sky was entitled to predeprivation process, it is undisputed that HemaCare received such process, and "any conclusion that Blue Sky did not receive predeprivation process necessarily would require a determination that it is not a successor entity or 'mere continuation' of HemaCare under Alabama law." (Doc. 29 at 17 n.2). The Commissioner contends, in other words, that the predeprivation process enjoyed by HemaCare inheres to Blue Sky's benefit because Blue Sky is a successor entity. Because this argument was made in passing in the reply brief without giving Blue Sky the opportunity to respond, the Court is not required to consider it. *See Singleton v. Taylor*, 2021 WL 3862001, at *9 n.15 (M.D. Ala. Aug. 25, 2011). If the Court did consider it, the Court would not be persuaded. The Commissioner cites no authority for the proposition that predeprivation process flows through or inures to the benefit of a successor corporation. Even if she had, the proposition as applied here assumes the conclusion that Blue Sky is a successor to HemaCare—a conclusion that the Commissioner reached without allowing Blue Sky an opportunity to tell its side of the story.

Accordingly, because Blue Sky received no predeprivation process, and because the Commissioner fails to explain how these facts resemble *Parratt* or *Hudson* so as to excuse the need for predeprivation process, Blue Sky has plausibly alleged an actionable procedural due process claim. *Cf. Barr*, 777 F. App'x at 302 (employing similar reasoning to conclude that business owner had adduced enough evidence to survive city's motion for summary judgment in case where city allegedly closed owner's business with no prior notice or opportunity to be heard).[9]

In sum, the Commissioner's argument hinges on the legal premise that, under *McKinney*, Blue Sky has no actionable due process claim so long as postdeprivation remedies are available. Applying *McKinney* to this scenario would require the Court to "gut[] any notions of predeprivation due process and blanketly hold[] that a state can effectuate any and all deprivations under a 'shoot first, ask questions later' mentality, so long as it offers *ex post facto* recourse." *Id.* As the *Barr* court stated, "[s]uch a reading would allow the *Parratt/Hudson* exceptions to swallow the rules articulated in *Zinermon* and *Mathews*." *Id.* It would also ignore other binding Eleventh Circuit decisions holding that predeprivation notice was required. *See, e.g.*, *Barnes*, 669 F.3d at 1307; *Fetner*, 813 F.2d at 1186. The Court declines to endorse such an approach.

---

[9] While the Court recognizes that *Barr* is an unpublished opinion, the Court finds its analysis persuasive.

33

### 2. Mootness

It follows from the above analysis that the Commissioner's mootness argument is unavailing. The Commissioner contends that Blue Sky's due process claim is moot because the March 29, 2021 letter notifies Blue Sky of the basis for its liability and reopens the window for it to request a fair hearing. As described above, Blue Sky alleges it was deprived of predeprivation notice and opportunity to be heard. The March 29 letter's offer of a postdeprivation fair hearing does not cure this problem because, as discussed above, postdeprivation remedies do not cure a failure to provide predeprivation process where predeprivation process was feasible.

### 3. Adequate Remedy at Law

Similarly, the Commissioner's argument that Blue Sky has an adequate remedy at law is unavailing. This argument again improperly frames Blue Sky's suit as purely monetary. For the reasons discussed above, it is not. Moreover, the Commissioner's position effectively nullifies the legal rule that postdeprivation remedies do not cure a failure to provide predeprivation process. Thus, the Commissioner has failed to demonstrate that Blue Sky has an adequate remedy at law that would render equitable relief inappropriate.

### 4. Whether Blue Sky's Claims are Contract Claims

Additionally, the Commissioner's argument that Blue Sky cannot bring this suit under § 1983 because its alleged injuries are based in contract is meritless. Blue Sky does not claim that the Commissioner breached the provider agreement. Rather, Blue Sky

claims that the Commissioner deprived Blue Sky of due process, unlawfully seized its property, unlawfully took its property, and worked an unlawful exaction—all in violation of the United States Constitution and independent from what the provider agreement requires.  That the provider agreement is part of the Commissioner's claimed justification for pursuing Blue Sky for the overpayments does not transform Blue Sky's claims into contract claims.

### 5.  Seizure

The Commissioner also argues that Blue Sky fails to state a seizure claim under the Fourth Amendment.  The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV.  A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  To determine whether the seizure comports with the Fourth Amendment, the Court must determine whether it was reasonable, using a "careful balancing of governmental and private interests." *Id.* at 71 (citation omitted).

The Commissioner's argument for dismissal rests on her contentions that (1) Blue Sky has no property interest in funds not yet paid to it and where an obligation is owed to Medicaid; (2) there was no seizure because Blue Sky consented to this procedure in the provider agreement; (3) if there was a seizure of property, it was reasonable because it comported with due process.  Thus, under the Commissioner's framing, Blue Sky's seizure

claim rises and falls with the due process claim.  As explained above, Blue Sky has a legitimate property interest in receiving full reimbursement for clean claims for services rendered.  Even accepting the Commissioner's assertion that an "obligation is owed to Medicaid," Blue Sky alleges that this obligation is based on overpayments allegedly made to another entity, HemaCare, and not to Blue Sky.  Additionally, the provider agreement does not undermine a finding of a seizure here.  In the provider agreement, Blue Sky consented to be responsible for overpayments to another provider if Blue Sky "acquired ownership" of that provider.  Apparently the Commissioner determined that Blue Sky had acquired ownership of HemaCare and thus was responsible for the overpayments pursuant to the provider agreement.  The problem is that, as discussed above, Blue Sky was neither aware that the Commissioner made this determination nor was able to be heard on the issue before the Commissioner started recoupments against Blue Sky.  Thus, the Commissioner's argument that no seizure occurred is unavailing.  Finally, the Commissioner's argument that the seizure was reasonable because it comported with due process fails in light of the Court's conclusion, *supra* Section V.C.1, that Blue Sky has plausibly alleged that the Commissioner has failed to provide constitutionally adequate predeprivation process.  Blue Sky alleges that the Commissioner began seizing portions of its clean claims to satisfy the debt of an unrelated entity with no prior notice that she was doing so or an opportunity to respond.  Thus, Blue Sky has plausibly alleged an unreasonable seizure claim, and the motion to dismiss the seizure claim is due to be denied.

### 6. Taking

The Commissioner next argues that Blue Sky fails to state a plausible takings claim. Blue Sky alleges that, by holding Blue Sky liable for a judgment of overpayments assessed against another entity without predeprivation process, the Commissioner has taken and is threatening to take Blue Sky's private property for public use without just compensation. Blue Sky further alleges that the Commissioner has not provided or offered any compensation for the money she has taken. The Commissioner contends that Blue Sky is in fact responsible for the overpayments because it bears successor liability; therefore, the Commissioner is not "taking" Blue Sky's property.

The Fifth Amendment states in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. This prohibition applies against the states through the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980). The Supreme Court has found takings where the state took money from private parties' accounts. *See id.* at 164 (statute allowing county to take interest earned on interpleader funds deposited with the court effected a direct appropriation of private property); *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 240 (2003) (transfer of interest earned in IOLTA accounts to the government is a *per se* taking). The Commissioner argues that those cases are distinguishable because they involved money held in "specific, unidentifiable accounts," unlike this case where "non-specific, unidentifiable money is allegedly owed." (Doc. 29 at 19–20). The Court disagrees with the Commissioner's characterization of Blue Sky's property as "non-

37

specific, unidentifiable money [that] is allegedly owed."   As explained above, providers submit clean claims based on services previously rendered to Medicaid patients. Medicaid's fiscal agent then reimburses the provider for those clean claims.   Thus, the reimbursements resulting from the submitted claims are specific, identifiable sums of money.   And under Alabama regulations, Blue Sky is entitled to receive reimbursement for timely submitted clean claims within twelve months of Medicaid's receipt.

The Commissioner's remaining arguments do not persuade the Court that Blue Sky fails to plausibly allege a cognizable takings claim.   For example, this case is distinguishable from *Swisher Int'l, Inc. v. Schafer*, 550 F.3d 1046, 1049 (11th Cir. 2008), because Blue Sky is not challenging the Commissioner's authority to recoup overpayments from either the original provider or a successor entity.   Rather, Blue Sky challenges the Commissioner's taking portions of its reimbursements to satisfy the debt of another Medicaid provider without predeprivation notice and opportunity to be heard.   Moreover, while the Federal Circuit has held that a statutory right to be paid money is not a property interest for purposes of the Fifth Amendment Takings Clause, *see Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004), the Commissioner cites no binding Eleventh Circuit or Supreme Court precedent adopting this holding.   Blue Sky's theory may be unique, but the Court nonetheless concludes that Blue Sky has stated a plausible takings claim.

### 7.  Exaction or Unconstitutional Condition

Finally, the Commissioner argues that Blue Sky fails to state a plausible exaction claim.   Exactions "involve a special application" of the "unconstitutional conditions"

38

doctrine "that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (citation omitted). The broader "unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.*

Blue Sky alleges that the Commissioner has unlawfully conditioned Blue Sky's property right to reimbursements for services rendered on its agreement to pay the debts of another Medicaid provider. The Court harbors doubts as to whether Blue Sky presents a viable exaction claim. However, the law in this area is underdeveloped and does not directly speak to the facts and legal theory presented here. Moreover, it is possible to construe the amended complaint as asserting a more general "unconstitutional conditions" claim. Thus, the Court cannot say that Blue Sky fails to state a plausible claim, and the Commissioner's request to dismiss it is due to be denied.

## VI.  CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED that the Commissioner's motion to dismiss (doc. 26) is DENIED.

Done this 29th day of November, 2021.

    _____/s/Emily C. Marks_____
    EMILY C. MARKS
    CHIEF UNITED STATES DISTRICT JUDGE